**CLAY et al. v. RICHARDSON.**

No. 3580.

Court of Civil Appeals of Texas. Amarillo.
April 8, 1931.

Rehearing Denied May 27, 1931.

F. W. Fischer and Bonner, Bonner & Childress, all of Wichita Falls, and W. L. Scott, of Graham, for appellants.

Taylor, Muse & Taylor, of Wichita Falls, and L. C. Counts, of Olney, for appellee.

HALL, C. J.

This action grows out of the sale by Clay to John Richardson of a moving picture business operated in Olney, Tex., by Clay and one B. T. Sanders; the contract of sale providing that the vendors nor either of them would enter into or engage· in the moving picture business in the town of Olney. Clay owned a town lot in Olney, upon which he later built and fully equipped a moving picture theater and was operating it through one L. K. Bray. Richardson brought suit, enjoining the operation of the competing show, and upon appeal the Fort Worth Court of Civil Appeals affirmed the judgment. See 290 S. W. 235, for a more detailed statement of the issues involved and the disposition thereof.

After the rendition of the judgment of the trial court enjoining the operation of the competing show, Clay and Bray, by permission of the trial judge, entered into a bond in the sum of $2,000, conditioned that they would prosecute their appeal with effect and would pay all damages which Richardson might suffer pending the appeal, and were permitted, upon the filing of said bond, to have the injunction suspended pending the appeal. Upon affirmance of the injunction judgment, Richardson sued Clay, Bray, and the sureties on that bond to recover as damages the profits which he alleges he lost pend-

ing the appeal because of the operation by Clay of the competing show. In that action he recovered a judgment for $3,150 against the principals ·in the bond and for $2,000 against the sureties, less $120 which the latter had paid as costs in the former suit. This case also found its way by appeal to the Fort Worth Court of Civil Appeals, and the judgment was reversed and remanded because of the admission and exclusion of certain testimony, and the Supreme Court refused a writ of error. See 9 S.W.(2d) 413.

Because the statements of the nature of the transaction and of the issues involved are full and clear as set out in the published reports referred to, it will not be necessary for us to make an extended statement here.

The judgment from which this appeal is prosecuted was in favor of Richardson, but for a less amount than was recovered against the principals in the bond upon the former appeal.

By the first five propositions the appellants contend that the petition was insufficient as against a general demurrer. That it shows to be a suit in the nature of a contempt proceeding for the violation of the injunction and is insufficient to recover in such an action, and that the bond given to suspend the perpetual injunction is not authorized by law, and the violation of its terms can form no basis for this action, and the damages claimed, being purely speculative, hypothetical, and remote, were not recoverable. It being further contended that the judgment against the sureties on the bond is not sustained by the pleading, because the petition fails to allege any violation of the terms of the bond by the sureties who were bound by its terms to pay only the amount of costs incident to the first appeal, which sums they have already paid.

As we understand the decision in 9 S.W. (2d) 413, these matters have all been definitely settled by the opinion of the Fort Worth court, and, even if we were authorized to hold differently, we would not do so because we approve the decisions with reference to such matters.

■■ By the sixth to tenth propositions appellants contend that the court erred in admitting secondary evidence to show the profits made and losses sustained by Richardson during the pendency of the appeal from the first judgment, without first having made the necessary proof of loss of primary evidence.

Reference to the last opinion in 9 S.W.(2d) 413, shows that the judgment upon which that appeal was based was reversed for this very reason and we are of the opinion that the grounds for again reversing it for that cause are more clearly reflected by the record than in the former appeal, and that the propositions urged are sound.

It is admitted and not denied that the appellee kept a set of books showing his receipts and expenditures in the operation of his moving picture show for each of the years 1925, 1926, and 1927, though from his own testimony it is probable that they were not accurate in every particular. As shown by the bill of exception, he testified that he spent most of the receipts during the period of time covered by the bond; that he did not deposit the receipts every day in any bank; that he paid cash for the film rentals and spent most of what was received. It appears that during the 1925 period he bought fifteen automobiles which cost from $2,000 to $8,000 each, but he does not remember how many theaters he conducted during 1925, or in what particular bank or banks he deposited the proceeds of his business. He is positive in his statement that he carried his books to Bowden & Co., who made out his income tax returns, and he says he does not know that he ever took the books away from their office after the return was made, that he did not think he had any further use for them. It appears that Bowden, Eads, King, and Clark were all connected in or with the firm of Bowden & Co., besides some clerical help from time to time. That firm maintained an office at Wichita Falls, one at Fort Worth, and one at Dallas. Eads is the only one of the four men mentioned who testified with reference to the books and the search made for them. Why neither of the others testified does not appear. The record shows that ·Eads was not in the office for about six months of the year 1925, and he testified that the other members of the firm, as well as employees, had access to the books. It further appears that the other members of the firm and its employees were available as witnesses, and yet they were not offered. We cannot presume that Bowden & Co. would have destroyed valuable records of a client intrusted to them. The presumption, under the record, is that the books are somewhere in the archives of that firm in either one of its three offices where they have been stored by some member of the firm or some employee. Plaintiff testified that he spent a great deal, in fact, most of all that he took in. That he does not remember of ever taking his books away from the office of Bowden & Co. When interrogated with reference to his income tax return, he said: "Well, I don't carry too much in my head, of course." He admitted that Bowden & Co. had given him a copy of his income tax report and that he probably had it somewhere, but had not looked for such copy. Eads testified that he presumed his firm had copies of the income tax report in their offices, and that the returns would show what Richardson received, and what he expended, but they were not produced.

■ The general rules in force in all common-law jurisdictions are as follows:

"Where a party seeks to introduce secondary evidence of the contents of documents, and as a foundation for the introduction of such evidence relies upon the fact that the original writings have been lost or destroyed or are inaccessible to him, he must first establish this fact by sufficient and satisfactory evidence." 22 C. J. 1045, § 1342.

"It may be stated as a broad and general rule that the law will require evidence that a diligent and bona fide but unsuccessful search has been made for the document, in the place where it belongs or is most likely to be found, and that the party has exhausted in a reasonable degree all accessible sources of information and means of discovery which the nature of the case would naturally suggest; and such evidence will be sufficient." 22 C. J. 1053, § 1353.

"As to the degree of diligence in searching for a lost document which must be shown in order to warrant the reception of secondary evidence of its contents, no inflexible rule can be laid down, but the question is one to be determined largely by the particular circumstances of the case. It has been considered necessary to show that the search was made with the utmost good faith and was as thorough and vigilant as though, were the paper not found, its benefit would be lost. If any suspicion hangs over the instrument, or there are circumstances tending to excite a suspicion that it is designedly withheld, the most rigid inquiry should be made into the reason for its non-production; but where there is no such suspicion, all that ought to be required is a showing of reasonable diligence in the effort to obtain the original." 22 C. J. 1055, § 1354.

█ █ The rule is settled in Texas that, as stated by the trial judge, there are no degrees in secondary evidence, and, while the appellants did not issue a subpœna duces tecum requiring Bowden & Co., or Richardson, to bring any copies of his income tax report, we think they were clearly entitled to these records, because they were admissible to impeach Richardson, if possible, who had stated broadly that his gross receipts were $400 to $500 per week before defendants began to compete with him, and that they were about $200 and less per week thereafter. Graham-Brown Shoe Co. v. Snodgrass (Tex. Civ. App.) 257 S. W. 632.

In Miller v. Cotten, 5 Ga. 341, Judge Lumpkin said: "I would sooner trust the smallest slip of paper for truth, than the strongest and most retentive memory, ever bestowed on mortal man."

In Whitaker v. Parker, 42 Iowa, 585, Judge Beck said: "The memory of men as to facts is not as satisfying to the mind as a writing, in an investigation involving past events."

And, in Thomas v. Paul, 87 Wis. 607, 58 N. W. 1031, 1032, Judge Orton said: "Oral testimony, depending on the memory of witnesses, is not as reliable as written or documentary evidence, but the jury would not usually need such an instruction. It is obvious and self-evident."

In Kent v. Manchester, 29 Barb. (N. Y.) 595, Judge Bacon said: "Recollections are sometimes vague, and impressions deceitful and illusory, but the written word stands, and speaks a uniform language."

While Richardson might not have been permitted to introduce his income tax report in his own behalf, as against an objection that it was a self-serving declaration, yet when his oral testimony is so unsatisfactory and no sufficient search has been shown for the books which constitute the primary evidence and only one custodian of the books was called as a witness, it would seem that the fact that Richardson had made no effort to secure or produce copies of his income tax report, secondary evidence though they may be, is a circumstance which we feel constrained to take into consideration in determining the question of his testimony upon the stand. His original income tax returns are shown from the record to be on file in Washington. The federal statutes permit, as do the laws of Texas, copies of such instruments to be made and furnished those who are entitled to them. His tax returns were made from his own records by his own agents, employed for that purpose, and are presumably correct statements from his books.

█ We do not consent to appellants' contention, however, that the income tax returns would be primary and original evidence. While that is the rule in some jurisdictions and while it is the further rule that there are degrees in secondary evidence, that doctrine does not obtain in Texas.

█ Special issue No. 4 does not submit the question of damages in accordance with what we understand the rule to be.

As said in 6 Page on Contracts, § 3218: "If one who has entered into a valid contract not to engage in a certain business breaks such contract and competes with the promisee, the only available measure of damages is the amount of profits which the promisee has lost by reason of such breach, together with the diminution in value, if any, of the property which the promisee purchased from the promisor under the contract for the sale of his business and the like, of which the covenant not to compete was a part. In spite of the fact that this rule permits the recovery of profits, it has been adopted by the courts as the only alternative to denying recovery. If the promisee is unable to show the amount of profits which he lost by reason of such breach, he can recover only nominal damages. He cannot recover profits which the promisor has earned in such competing business."

852

The appellants complain of the failure of the court to submit the issue of proximate cause and refusal to define it in his charge.

While the general rule for recovering damages in cases of breach of contract is that plaintiff must prove the damages claimed to have been the direct and immediate result of the breach by defendant, in our opinion proximate cause is foreign to the issues in a case of this character where no damages have resulted either to the person or corporeal property of the complaining party. We have found no case which sustains the appellants' insistence, and they cite none. In actions against carriers, railroads, telegraph and telephone companies, insurance companies, and between master and servant, where injuries either to the person or property of the complainant is the basis for the suit and the question of negligence or contributory negligence enters into the controversy, of course, proximate cause has its proper place. In the instant case proof of breach of the contract would entitle plaintiff to at least nominal damages, and the burden rested upon him to show the extent of the profits lost by reason of the breach. If his profits were reduced by reason of an inferior class of pictures exhibited, or unpopularity of the owner or the manager of the business or to unattractiveness of the place from any cause whatever, he, of course, should not be entitled to recover losses resulting from such causes, but, as we understand the doctrine of proximate cause, it would have been improper for the court to have applied it to a case of this character.

By the nineteenth proposition it is insisted that the court erred in failing and refusing to admit in evidence the testimony sought to be elicited from the plaintiff on cross-examination showing that during the period in controversy plaintiff was a gambler, was plying his profession at Olney and at other places, including Mexico, and was using the cash proceeds from his picture show for the purpose of gambling; that he sometimes won and sometimes lost.

Bill of exception No. 2 is the basis for this proposition. All of the matters set out in the bill were passed upon on the former appeal, and the only new matter to be settled here is with reference to the plaintiff's gambling. We question the right of appellants to inquire into his gambling propensities and practices. Of course, if he was away from his business in Old Mexico and on the border and in other places for any appreciable length of time and denied that he was absent, then for the purposes of impeachment they might show that he was not at his place of business, and, if necessary, should be permitted to prove that he was away on a gambling excursion, but that is not the question presented here. In the evidence excluded, no effort was made to show how much money he lost, if any, in his gambling excursions. In so far as the court excluded the remainder of the testimony set out in the bill with reference to his extravagance and profligacy, that ruling was held to have been error on the former appeal. If in his suit for divorce he made an affidavit to the effect that his community property on hand was only $3,000, the affidavit would be the best evidence of its contents, and secondary evidence would not be admissible until the failure to produce the affidavit itself was properly accounted for. Evansich v. G., C. & S. F. Ry. Co., 61 Tex. 24; Waggoner v. Moore, 45 Tex. Civ. App. 308, 101 S. W. 1058; Jaffee v. Deckard (Tex. Civ. App.) 261 S. W. 390; P. & N. T. Ry. v. Porter (Tex. Civ. App.) 156 S. W. 267. He had no clear recollection of how many banks he patronized, nor could he tell how many moving picture shows he was operating in Olney and other places. He admitted having bought fifteen automobiles that ranged in price from $2,000 to $8,000, and the only account he could give of expenses was that he disbursed $50,000 paying expenses. He borrowed money in large sums from his father, and the bill of exception shows that he was extravagant in spending his money and careless in keeping his accounts.

It is true the jury found in answer to the third special issue that W. T. Clay told Bird at the time the latter sold the $1,500 note for $900 that the injunction suit would be dismissed and the bondsmen released. This, however, if true, would not be a defense to an action for lost profits sustained, in a suit brought upon the bond.

For the reasons stated, the motion for rehearing is overruled, our former opinion is withdrawn, and the judgment is reversed, and the cause remanded.